JUDE G. GRAVOIS, Judge.
| ?M.L. has appealed a juvenile court judgment terminating her parental rights. For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY

On June 19, 2007, 39-year-old M.L. gave birth to E.S.P.[1] The record reflects that A.P. is listed on E.S.P.’s birth certificate as her father. Apparently, he has not *403 been involved in her life.[2] On April 1, 2010, E.S.P. was living with her mother and grandmother in a home with several animals. On that date, E.S.P.’s grandmother summoned police because an intoxicated M.L. had dug up the corpses of two animals that had died about six months earlier and brought the corpses into their house. This incident resulted in M.L.’s being committed to a psychiatric hospital. Authorities deemed the house unsafe for E.S.P. due to animal excrement and urine found in the house. E.S.P. was placed in foster care.
|sOn June 1, 2011, the Department of Children and Family Services (“DCFS”) filed a Petition for Termination of Parental Rights seeking to terminate M.L.’s parental rights of E.S.P. pursuant to La. Ch.C. art. 1015(5). An attorney was appointed to represent E.S.P. in the proceeding. M.L. retained private counsel, and denied the allegations of the petition.
The termination hearing was set for September 19, 2011. However, on August 16, 2011, M.L. was granted a continuance because she was being evaluated by a privately-retained psychologist.- At a status conference held on September 13; 2011, M.L.’s attorney requested a continuance in order to allow him to review the DCFS file. On September 29, 2011, DCFS requested a continuance because a key witness was unavailable.
On January 17, 2012, DCFS' and M.L. entered into a consent judgment. The judgment provided that the trial on the termination of parental rights petition was continued without date on the motion of DCFS, and that M.L. had to; (1) find appropriate child care for E.S.P.; (2) have two two-hour home visits per week, supervised and progressing to unsupervised; (3) attend E.S.P.’s weekly speech therapy; (4) obtain a bed, clothing, and storage for E.S.P.’s things; (5) develop a budget for E.S.P.’s return; and (6) have adequate food for - E.S.P. The judgment further provided that a review hearing would be held on February 28, 2012. On February 28, 2012, the trial court ruled that the status of the matter was to remain the same. . On March 6, 2012, M.L.’s private attorney withdrew from the case and M.L. was appointed counsel. On March 20, 2012, M.L.’s appointed attorney moved for a continuance because he had been unable to contact M.L.
On April 10, 2012, a hearing was held in which testimony was taken from Samantha Barker, the DCFS case worker, Brittney Bergeron of Court Appointed Special Advocates for Children (“CASA”), and Priscilla Plummer, the foster | ^mother of E.S.P. A transcript of this testimony is not contained in the appellate record. M.L. and her attorney were present for this hearing. According to the minute entry for this hearing, the court ordered that visitation of E.S.P. by M.L. be supervised by the “infant team” and that a termination hearing be held on June 18, 2012. A judgment signed on April 10, 2012 in connection with this hearing noted the case plan goal to be adoption and that this permanent plan is the most appropriate and in the best interest of E.S.P.
After several continuances, a termination hearing was held on August 13, 2012. At the hearing, Samantha Barker testified that she was the case manager for M.L. and E.S.P. She explained that E.S.P. was taken into custody on April 1, 2010 because of neglect and inadequate shelter. She prepared the case plan to work towards reunification. She informed M.L. that her failure to comply with the case *404 plan could result in termination of her parental rights. M.L. was compliant with attendance and participation with all aspects of the case plan with the exception of removing the carpeting from the home and successfully completing the Tulane Infant Team program. When Ms. Barker “inherited” this case from the initial worker in August 2010, she went to M.L.’s home and it smelled of urine and feces. The case plan was modified to require removal of carpet from the home. M.L. did not remove the carpeting until June 2011. M.L. told Ms. Barker that her attorney stated that she did not have to remove the carpet, and that she and friends who come over to the house “[did] not smell anything.”
The last visit Ms. Barker observed between M.L. and E.S.P. took place at a children’s-themed restaurant. During the middle of this visit, E.S.P. was observed running around with pizza in her hand. She also had pizza all over her face. When asked about this by Ms. Barker, M.L. stated that E.S.P. wanted to play and did not want to sit down. Ms. Barker observed that M.L. was failing to set down any [¿parental constraints for E.S.P. Ms. Barker testified that one of the concerns with the experts on the Infant Team was that M.L. did not have the ability to set limits for E.S.P. It was apparent to Ms. Barker that after over twenty months of therapy with the Infant Team, M.L. was still dependent on a lot of directions during her visits with E.S.P.
Ms. Barker visited M.L.’s home on a monthly basis to monitor her progress. She continued to detect the strong odor of feces and urine on her visits to the home. She described one visit in which she actually slipped on a substance on the floor that she thought to be animal urine. Ms. Barker testified that the agency met and determined that it was in E.S.P.’s best interest for M.L.’s rights to be terminated and for E.S.P. to be freed for adoption.
On cross-examination, Ms. Barker admitted that she was not always able to visit the home on a monthly basis because sometimes when her visits were unannounced, M.L. would not answer the door. The last time she had visited M.L.’s home was in March 2012.
Ms. Barker also testified that E.S.P. made tremendous improvement in her developmental delays since receiving speech and language therapy, as well as occupational and play therapy. E.S.P. was in a foster home that had two older adopted girls. She had bonded to these girls and they included her in their activities.
Dr. Madeleine Blancher, a pediatrician, testified that she worked with the Tulane Infant Team as a child psychiatric fellow from July 2010 through June 2011. In her intake interview with M.L., she described the episode that precipitated E.S.P.’s being taken into custody. M.L. admitted to her that she was depressed at that time and had been drinking and taking pills when she brought the animal corpses into their house. M.L.’s mother summoned the police. M.L. stated | fito Dr. Blancher that contrary to the police report stating there was excrement and urine all over the house, there were only two piles of dog feces in the home at that time, which in her opinion was the result of the dogs being excited because there were new people in the house.
M.L. advised Dr. Blancher that years earlier, someone had complained to authorities about the number of cats she had at her home. Due to this complaint, M.L. voluntarily gave custody of her three other children to her sister. These children have not returned to live with M.L.
Dr. Blancher testified that, in her opinion, E.S.P.’s obvious developmental delays *405 when she was taken into custody were not caused by any inherent deficits of E.S.P.
Dr. Blancher worked with M.L. for eleven months as part of the Tulane Infant Team. The first program M.L. was enrolled in through the Infant Team was Toddler Talk, which Dr. Blancher described as a basic parenting program. Since E.S.P. was not speaking at the time she was taken into custody, M.L. was enrolled in this program because it has been shown that speech development comes from interaction with parents. This program included parents imitating the child’s play and sharing things. As evidenced by her lack of interaction with E.S.P. during visits, it was apparent to the Infant Team that M.L. did not understand the concepts presented. According to Dr. Blancher, when M.L. visited with E.S.P., there was parallel play with very little interaction. M.L. was then moved to a program called Circle of Security, an eight-week parenting course with the goal of the parent learning the child’s needs and learning how to respond to those needs. M.L. could describe the principles introduced, but during her visits with E.S.P., she had difficulty putting these principles into practice. A concept would be explained to M.L. one week, but she seemed to have forgotten the concept by the next week. [7Pr. Blancher testified that “this went on for months.” During this time, M.L. would visit with E.S.P. as part of the program and would also visit with E.S.P. one time per week at the DCFS office. M.L. was not able to complete this program, nor was there was any reasonable expectation that she would be able to complete the program in the future. Because M.L. was neither able to describe E.S.P.’s needs, nor fulfill those needs, in April 2011 it was decided that visit-coaching for M.L. would be attempted. Dr. Blancher was not involved in the visit-coaching with M.L. On cross-examination, Dr. Blancher testified that in her opinion, M.L. did not have anxiety over the controlled nature of the settings of the visits; rather, M.L.’s anxiety was in dealing with E.S.P.
Dr. Anna Smyke, an associate professor at Tulane, was accepted as a developmental psychologist expert by the court. She testified that at the time E.S.P. was taken into custody, she would “go around on all fours” and would bark from time to time. She was delayed in terms of communication, fine motor skills, gross motor skills, and problem solving. She was impaired in terms of imitating play and mastering motivation and other things that would be expected of a child who was almost three years old. She was also “stuffing food” and was aggressive with other children in the foster home. She screamed at the sound of a vacuum cleaner. E.S.P. was immediately placed in therapy. Dr. Smyke opined that there was nothing in E.S.P.’s medical records to indicate that she had any inherent deficits; rather, the developmental delays she had were a response to her environment. Dr. Smyke testified that, after completing sixteen months of speech and language therapy and thirteen months of occupational therapy, E.S.P. had met all of the goals of her therapy.
Dr. Smyke also testified that M.L. participated in visit-coaching, which is to give a parent concrete directions as to how to identify the child’s needs and then |smeet those needs. Visit-coaching for M.L. started in April 2011. The purpose of visit-coaching was to make sure that the parent can identify the child’s needs and problem-solve about meeting those needs in order to keep the child safe. The ease worker would meet with M.L. for fifteen to twenty minutes to prepare her for her one-hour visit with E.S.P., and then meet with her again for fifteen minutes after the visit for debriefing. Although M.L. came to *406 almost every appointment, she did not make progress in being able to identify E.S.P.’s needs and then figure out how to meet those needs. Dr. Smyke occasionally had to go into the room with M.L. to help with her visits with E.S.P. According to Dr. Smyke, all of these programs had worked with other parents who did not have a lot of child-rearing insight. When M.L. visited with E.S.P., M.L. would either be too intrusive and ask too many questions, or would “shut down” when the visit got overwhelming.
Dr. Smyke explained that M.L. could follow their suggestions, but there were concerns as to whether M.L. could care for E.S.P. if she was unsupervised. She related a visit in which E.S.P. ran into a wall with a scooter and M.L. did nothing about this behavior. During some visits, Dr. Smyke would have to go into the room and calm E.S.P. down, but stated that this was supposed to be M.L.’s job. During the last three visits, Dr. Smyke had to go into the room to assist M.L. for 30-45 minutes out of the one-hour visits. When M.L. was debriefed after these visits, she did not have the- insight to say what she should have done differently. In Dr. Smyke’s opinion, M.L. did not have the insight into the issues that brought E.S.P. into custody, despite the issues having been clearly pointed out to her.
Dr. Smyke participated in thirty-six sessions with M.L. and E.S.P. They tried visits both at the Infant Team facility and at home, and determined that the -home environment was not safe for E.S.P. Dr. Smyke concluded that M.L. loves E.S.P., and even though she tried her best, she could not safely parent E.S.P. 19Pespite her participation in programs that have helped other parents with impairments, M.L. had not gotten to the point where she could meet E.S.P.’s needs. Dr. Smyke explained that M.L. did not have the capacity to put into practice the techniques discussed in therapy. Dr. Smyke opined that if E.S.P. were returned to M.L., M.L. would quickly become overwhelmed and would neglect E.S.P. Dr. Smyke testified that there was no reasonable expectation of a significant improvement in M.L.’s conduct in the near future.
Dr. Alan James Klein, an expert psychologist, was called to the stand by M.L. Dr. Klein first examined M.L. in August 2011 on referral from her attorney. He saw M.L. a total of twenty times. He found that she had psychotic depression which had led to the removal of E.S.P. He opined that M.L. was depressed during this event because her teenagers had been removed from her home, she was in dire financial straits, and she felt responsible for the death of her dog and wanted to die. Dr. Klein stated that this was an acute disorder, and as long as M.L. does not drink and takes her medicine, an incident such as this would not happen again. He opined that M.L. did not have any addictions, noting that she had been going to Alcoholics Anonymous and all of her drug screens had been negative. He diagnosed M.L. as having anxiety disorder.
Dr. Klein testified that he did not find anything that would compromise M.L.’s ability to parent and her ability to provide a reasonable standard of care for E.S.P. The results of testing performed on M.L. were consistent with someone who has a high school education. Dr. Klein stated that M.L. had worked hard to get E.S.P. returned to her. This included taking several buses to numerous appointments and removing the carpet in her home. He admitted that over the course of therapy, he observed E.S.P. and M.L. together on only one occasion. During this encounter, E.S.P. sat in M.L.’s lap and he did not see anything unusual |inor problematic. Dr. Klein related one visit in which E.S.P. *407 asked for her grandmother and started to cry when she was told that her grandmother could not come to visit her. Dr. Klein opined that this shows E.S.P.’s attachment to M.L., as well as to her grandmother.
M.L. testified as to the events leading up to E.S.P.’s removal from her home. She explained that several months earlier, she had a Pekingese and then rescued a pit bull. In her view, the stress of having the pit bull around caused the Pekingese to have a heart attack and die. Six months later, because she was feeling guilty and was still depressed over this, she bought beer and vodka and consumed them with her medications — Ativan and Celexa. At that time, she had four Pekingese and five cats. The animals stayed outside during the day and slept in the storage room at night. She admitted that on the day of the incident when E.S.P. was removed from the home, the carpet in her home was probably soiled. She stated that E.S.P. sometimes had “accidents” on the carpet. She explained that she cleaned the carpet, but the carpet cleaner did not always work. Her understanding of the case plan was that she was not required to remove the carpet; rather, in response to the ease plan, she had the carpet steam-cleaned and the house sprayed for fleas every three months. Also, she removed the carpet in June of 2011 and replaced it with new tile. She no longer has any dogs, and only two outside cats. She stated that she has paid support, has gone to parenting classes, has gone to Alcoholics Anonymous, and has been sober for twenty-eight months. She purchased games and videos for visits with E.S.P. and they would cuddle and watch movies during the visits. She acknowledged that on one visit, E.S.P. rode her bike into a wall, explaining, however, that the collision was “not hard.” Before E.S.P. was removed from her home, she provided all of her care, including taking her to the doctor. All lnof E.S.P.’s vaccinations were up to date. She felt that she could be a competent parent and would do everything that she has to do to take care of E.S.P.
Priscilla Plummer testified that she was the foster mother of E.S.P. When E.S.P. first came into her care, she was not talking, would save food in one side of her mouth, and “just stared.” She testified that E.S.P. is presently a cheerful child who talks, plays, rides her bike, skates, and swims. Ms. Plummer’s extended family treats E.S.P. as part of the family and buys her Christmas and birthday gifts, just as they do for other children in the family. E.S.P. accompanies them on family outings. Ms. Plummer testified that she loves E.S.P., and if she is freed for adoption, intends to adopt her.
Jane Briscoe, E.S.P.’s CASA worker for just under two years, testified that at first E.S.P. did not respond when spoken to, but now is friendly, talkative, and playful. Ms. Briscoe had seen E.S.P. with M.L. multiple times over these two years, and based on these observations as well as on information she obtained from the Infant Team and DCFS, it was her opinion that it would be in E.S.P.’s best interest for M.L.’s parental rights to be terminated and for E.S.P. to be adopted by Ms. Plum-mer.
At the conclusion of the hearing, the trial judge stated:
[M.L.,] there is no doubt in the court’s mind that you love this child very much and that you’ve done everything you could do to try to have the child returned, but the court is convinced that you are not able to parent this child based on your inability to translate into action what you’ve learned in these parenting classes and for me to return that *408 child would place the child at risk. And for these reasons, the court is going to terminate your rights. I find that the State has — The court believes that the State has proven the case by clear and convincing evidence.
This timely appeal by M.L. followed.
| ^ASSIGNMENT OF ERROR
In her only assignment of error, M.L. argues that she has substantially complied with her case plan. In support of this argument, she refers to the testimony of Dr. Smyke that she participated fully with everything the Tulane Infant Team requested of her, and that she was always open to suggestions and willing to try different techniques that were offered to her. M.L. states that Dr. Smyke believed that M.L.’s behaviors during visits could have been the result of M.L.’s feeling that she needed to perform in front of the doctors.
M.L. also cites to the testimony of Dr. Klein who found that she had no substance abuse issues and that the incident that led to E.S.P.’s coming into State care was an acute disorder that would not happen again. Dr. Klein testified that the Infant Team and DCFS perceived M.L. as being uncaring because of her lack of emotion towards her daughter. However, Dr. Klein testified that M.L. had told him that she felt she had to be strong in front of DCFS and the Infant Team. Dr. Klein testified that M.L. had done everything she could to comply with the case plan.
M.L. then points to her own testimony that she was not originally required to remove the carpets, just to clean them. She has had her house sprayed for flees every three months. She participates in Alcoholics Anonymous and has been sober for twenty-eight months. She presently has no dogs and only two outside cats. She has purchased books, video games, and educational videos for her daughter to play with during unsupervised visits. She has purchased a bed and clothing and has been saving money for two years to prepare for the day when E.S.P. was returned to her.
11SM.L. also points out that in early 2012, the case plan goal was changed from adoption to reunification and contends that had she not been making progress, the case plan would not have been changed to recommend reunification. M.L. concludes that there was no testimony that she did not comply with her case plan as she did everything that was asked of her by DCFS and the Tulane Infant Team. M.L. argues that because Ms. Barker had not visited the home since March 2012, there was no evidence presented at trial as to the condition of the home at the time of trial. In support of this argument, she points to Ms. Barker’s testimony in which she was unable to state whether any home visits had been conducted between March 2012 and the termination hearing in August 2012.
DCFS responds that the trial court’s finding that it proved the grounds for termination is not manifestly erroneous. DCFS argues that the “psychotic break” that M.L. experienced in April 2010 revealed serious neglect of E.S.P. DCFS contends that the developmental delays suffered by E.S.P. were the result of long term, chronic neglect. E.S.P. had no social skills, crawled on all fours, barked, and became upset at loud noises. She stared into space and made no attempt to communicate. After extensive therapy, however, she was now thriving. In contrast, after two years of intensive services and hands-on training, in which M.L. “tried her hardest,” she was unable to internalize, generalize, or apply any of the parenting skills she was taught. DCFS contends that the causes that brought E.S.P. into foster care still exists. DCFS concludes that M.L. cannot show manifest error in the trial *409 court’s decision or that the trial court’s decision was clearly wrong.
| ¡¿ANALYSIS
The petition to terminate M.L.’s parental rights was filed pursuant to La. Ch.C. art. 1015(5), which provides:
The grounds for termination of parental rights are:
[[Image here]]
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
While parents have a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with their children, the State has a legitimate interest in limiting or terminating parental rights under certain conditions. State in the Interest of A.C., 93-1125 (La.1/27/94), 643 So.2d 719, cert. denied, 515 U.S. 1128, 115 S.Ct. 2291, 132 L.Ed.2d 292 (1995). To terminate parental rights, one of the grounds for termination set forth in La. Ch.C. art. 1015 must be established by clear and convincing evidence, and termination must be found to be in the child’s best interest. State ex rel. D.L.R., 08-1541 (La.12/12/08), 998 So.2d 681, 688.
The manifest error standard applies to appellate review of the trial court’s findings as to whether parental rights should be terminated. State ex reí. K.G., 02-2886 (La.3/18/03), 841 So.2d 759, 762. Whether a parent has complied with a case plan is a question of fact that may not be set aside in the absence of manifest error or unless clearly wrong. State ex rel. J.T. v. J.M., 46,090 (La.App. 2 Cir. 12/12/10), 56 So.3d 1009,1012.
115Our review of the record indicates that DCFS proved by clear and convincing evidence that there is no reasonable expectation of significant improvement in M.L.’s condition or conduct in the near future, considering five-year-old E.S.P.’s need for a safe, stable, and permanent home. Dr. Blancher testified that she worked with M.L. for a period of eleven months using two different parenting classes to teach M.L. how to identify and meet her child’s needs. It was apparent to Dr. Blancher that M.L. did not understand the concepts presented because when M.L. visited with E.S.P., there was parallel play with very little interaction between M.L. and E.S.P. M.L. was then enrolled in an eight-week parenting course called Circle of Security in which the parent is to learn the child’s needs and learn how to respond to them. Dr. Blancher explained that M.L. could describe the principles introduced, but had difficulty putting these principles into practice in her visits with M.L. A concept would be explained to M.L. one week, but by the next week, she had forgotten the concept. Dr. Blancher explained that “this went on for months.” During this time, M.L. would visit with E.S.P. as part of the program and would also visit with E.S.P. one time per week at the DCFS office. The evidence indicates that M.L. was not able to complete this program, nor was there was any reasonable expectation that she would be able to complete the program in the future. Because M.L. was neither *410 able to describe E.S.P.’s needs, nor fulfill those needs, in April 2011 it was decided to try visit-coaching for M.L.
Dr. Smyke testified that she participated in thirty-six visit-coaching sessions with M.L. and E.S.P. Visit-coaching gives direct, concrete instructions to help the parent learn how to identify the child’s needs and meet those needs. Dr. Smyke explained that the purpose of visit-coaching is to make sure that the parent can identify the child’s needs and problem-solve about meeting those needs in order to |1fikeep the child safe. Dr. Smyke stated that she met with M.L. for fifteen to twenty minutes to prepare her for her one-hour visits with E.S.P., then for fifteen minutes after each visit for debriefing. Dr. Smyke explained that M.L. came to almost every appointment, but she did not make progress in identifying what E.S.P. needed and then figuring out what to do about it.
Dr. Smyke explained that M.L. could follow them suggestions, but there was a question of whether M.L. could care for E.S.P. if she was unsupervised. Dr. Smyke testified that during the last three visits, she had to go into the room for BO-45 minutes of the one-hour visit. When M.L. was debriefed after these visits, she did not have the insight to say what she should have done. Dr. Smyke stated that M.L. did not have the insight into the issues that brought E.S.P. into custody, despite the issues having been pointed out to her.
Dr. Smyke further explained that they tried visits both at the Infant Team facility and at home, but determined that the home environment was not safe for E.S.P. Dr. Smyke concluded that M.L. loves E.S.P., but even though she tried her best, she could not safely parent E.S.P. Despite her participation in these programs that have helped other parents with impairments, M.L. had not gotten to the point where she could meet E.S.P.’s needs. Dr. Smyke explained that M.L. did not have the capacity to put the techniques discussed in therapy into practice. She opined that if E.S.P. were returned to the home, M.L. would quickly become overwhelmed and would neglect E.S.P. Dr. Smyke testified that there was no reasonable expectation of a significant improvement in M.L.’s conduct in the near future.
While we acknowledge that Dr. Klein ■ testified that he did not find anything that would compromise M.L.’s ability to parent and provide a reasonable standard of care for E.S.P., we note that Dr. Klein only observed a visit between M.L. and E.S.P. on one occasion. Further, Dr. Klein’s testimony focused on his opinion that |17the events surrounding E.S.P.’s removal from the home were unlikely to reoccur. However, Dr. Klein did not address the severe developmental delays suffered by E.S.P., which were reportedly the result of neglect by M.L.
M.L. argues that she must have been making progress in treatment because the case plan changed from adoption to reunification in early 2012. A review of the record indicates that a consent judgment was entered into on January 17, 2012 which required M.L. to perform certain tasks with a plan for a gradual return of E.S.P. to her. On February 28, 2012, a permanency hearing was held in which M.L., Ms. Barker, the case manager for DCFS, Ms. Briscoe, the CASA worker, and Ms. Plummer the foster mother testified. This testimony is not part of the appellate record. The record indicates that the permanent plan for E.S.P. was reunification, with a gradual return to M.L.’s home, but if this was unsuccessful, DCFS would proceed with termination of M.L.’s rights.
The record reflects that at a status hearing on March 20, 2012, M.L.’s attorney *411 moved for a continuance because the attorney was unable to contact M.L. On April 10, 2012, a hearing was held in which testimony was taken from Ms. Barker, Brittany Bergeron from CASA, and Ms. Plummer. This testimony is also not part of the appellate record. At the conclusion of this hearing, the trial court ordered supervised visitation and set a date for the termination hearing. Consequently, although M.L. may have made some type of improvement for DCFS to attempt to work towards reunification, clearly the testimony taken at the April 10, 2012 hearing indicated that something had occurred which prompted the court to order supervised visitation and change the permanent plan from reunification to adoption.
Finally, the testimony taken as a whole indicates that it is in the child’s best interest for M.L.’s parental rights to be terminated. Ms. Barker, the case manager |lsfor DCFS, testified that it is in the child’s best interest for the parental rights to be terminated and the child be freed for adoption. The CASA worker, Ms. Briscoe, testified that it is in E.S.P.’s best interest for M.L.’s parental rights to be terminated and for E.S.P. to be adopted by Ms. Plum-mer. Ms. Plummer testified that E.S.P. had been in her custody for approximately three years and had remarkable improvement in her communication and social skills, and was thriving. Ms. Plummer testified that she and her family loved E.S.P. and she planned to adopt her if M.L.’s rights were terminated.
In sum, after a thorough review of the record and the evidence in this case, we find that DCFS proved by clear and convincing evidence that there is no reasonable expectation of significant improvement in M.L.’s condition or conduct in the near future, considering five-year-old E.S.P.’s need for a safe, stable, and permanent home. Further, termination of M.L.’s parental rights is in the best interest of E.S.P., who has bonded with her foster family with whom she has been living for over three years. Despite DCFS’s providing intensive programs for M.L. in an attempt to teach her to identify and meet her daughter’s needs, M.L. was unable to gain any insight into her daughter’s needs. The testimony indicates that M.L. did not actually grasp the reason E.S.P. was removed from her care, thus she was unable to make any changes so as to allow the child to be returned to a safe environment. Adults can take years to improve their functioning, but developing children do not have such time, as children’s lives are significantly disrupted while their parents attempt to deal with their own problems. State in the Interest of C.D., 558 So.2d 806 (La.App. 5 Cir.1990).
| ^CONCLUSION
For the foregoing reasons, the judgment of the juvenile court terminating M.L.’s parental rights is affirmed.

AFFIRMED

. In order to protect the minor’s identity, we will refer to her and her parents by their initials in this opinion. La. Ch.C. art. 412.

. A.P.’s whereabouts are unknown. Further, E.L., Jr., who was alleged to be E.S.P.’s "natural father,” has voluntarily surrendered his rights to E.S.P.